RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SAMUEL MULLET, SR. (15-3212); LESTER MULLET (15-3231); LEVI MILLER (15-3232); ANNA MILLER (15-3237); JOHNNY S. MULLET (15-3246); EMANUEL SCHROCK (15-3247); RAYMOND MILLER (15-3249); KATHRYN MILLER (15-3250); ELI MILLER (15-3267); DANIEL S. MULLET (15-3268); LESTER M. MILLER (15-3269); LINDA SCHROCK (15-3270); LOVINA MILLER (15-3273); ELIZABETH MILLER (15-3275); EMMA MILLER (15-3277),

*Defendants-Appellants*.

> Nos. 15-3212/ 3231/ 3232/
> 3237/ 3246/ 3247/ 3249/ 3250/
> 3267/ 3268/ 3269/ 3270/ 3273/
> 3275/ 3277

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:11-cr-00594—Dan A. Polster, District Judge.

Argued: April 19, 2016

Decided and Filed: May 4, 2016

Before: SUTTON and GRIFFIN, Circuit Judges; SARGUS, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Wendi L. Overmyer, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Akron, Ohio, for Appellants in 15-3212, et al. Joseph P. Morse, JOSEPH P. MORSE & ASSOCIATES, Cleveland, Ohio, for Appellant in 15-3232. Mark R. Butscha, Jr., THOMPSON HINE LLP, Cleveland, Ohio, for Appellant in 15-3237. Christine Ku, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Wendi L. Overmyer, Edward G.

_____

[*]The Honorable Edmund A. Sargus, Jr., Chief United States District Judge for the Southern District of Ohio, sitting by designation.

1

Bryan, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Akron, Ohio, Nevin E. Johnson, Hudson, Ohio, for Appellants in 15-3212, et al. Joseph P. Morse, JOSEPH P. MORSE & ASSOCIATES, Cleveland, Ohio, for Appellant in 15-3232. Mark R. Butscha, Jr., John R. Mitchell, Matthew D. Ridings, Holly H. Little, THOMPSON HINE LLP, Cleveland, Ohio, Joseph B. Rose III, THE ROSE LAW FIRM, Cleveland, Ohio, for Appellant in 15-3237. Damian A. Billak, Canfield, Ohio, for Appellant in 15-3231. Robert E. Duffrin, WHALEN DUFFRIN LLC, Boardman, Ohio, for Appellant in 15-3246. Nathan A. Ray, Akron, Ohio, for Appellant in 15-3247. James S. Gentile, Youngstown, Ohio, for Appellant in 15-3267. Samuel G. Amendolara, AMENDOLARA & RAFIDI, LLC, Boardman, Ohio, for Appellant in 15-3268. J. Dean Carro, BAKER, DUBLIKAR, BECK, WILEY, & MATTHEWS, North Canton, Ohio, for Appellant in 15-3269. Joseph A. Dubyak, Cleveland, Ohio, for Appellant in 15-3270. David C. Jack, Wadsworth, Ohio, for Appellant in 15-3273. Bridget M. Brennan, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, Diana K. Flynn, Thomas E. Chandler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

SUTTON, Circuit Judge. This is a sequel. In the first appeal, we addressed a jury verdict that convicted sixteen members of the Bergholz, Ohio, Amish community of hate crime and obstruction-of-justice charges stemming from a spate of hair-cutting and beard-shearing attacks. We reversed the hate crime convictions because the relevant jury instruction was inconsistent with an intervening Supreme Court decision. 767 F.3d 585 (6th Cir. 2014). On remand, the government declined to re-try those charges, and the district court resentenced the defendants on the remaining convictions.

In this second appeal, the defendants challenge their remaining convictions on grounds that could have been, but were not, raised in the first appeal. In addition, the defendants object to certain features of their new, lower sentences. We affirm.

I.

Around 2001, the Bergholz Amish community became a separate church district within the Old Order Amish, one of 474 such districts in Ohio. Its bishop, Samuel Mullet, Sr., exercised considerable influence over the community and assumed the power to "shun"

(excommunicate) members who strayed from church doctrine. R. 540 at 296. He used that power in 2006 for several church members who questioned his leadership. Other communities generally may not admit an excommunicated member until he receives forgiveness from the community that first shunned him. The Bergholz excommunications proved to be an exception. Other Amish bishops reversed the decisions in September 2006, agreeing that communities outside Bergholz could admit the excommunicated members.

The excommunications split those who supported Bergholz from those who did not, straining parent-child and husband-wife relationships in the process. One couple divorced and went through a protracted custody dispute, which culminated in a court order that precluded some of Samuel's grandchildren from spending any parenting time in Bergholz. The idea of cutting beards first arose from these events. Some Bergholz residents cut their own beards as a way to atone for the sins that, as they saw it, prompted the loss of the children. When the Bergholz members turned the ritual on others for the sake of punishment, the victims were parents, friends, and others who had criticized the Bergholz practices and had left the community.

Each assault after the excommunications schism proceeded in a similar way. Hired cars facilitated travel between Bergholz and other communities. Several assailants sliced off a man's beard or, in one case, a woman's long hair. Doing so often entailed grabbing a man by his beard, forcing him into a chair, and holding him there as he struggled to avoid the scissors, electric trimmer, or horse shears that robbed him of a defining part of his Amish identity. On at least two occasions, the assailants photographed the events on a disposable camera.

Local enforcement authorities, and eventually the FBI, responded to the attacks. A federal grand jury indicted sixteen Bergholz residents on three types of charges: (1) violating the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, (2) concealing evidence, and (3) lying to the FBI. Each defendant faced at least one of six hate crime counts stemming from the hair-cutting and beard-shearing assaults. 18 U.S.C. § 249(a)(2). Several defendants faced counts of concealing evidence, with one count related to hiding the disposable camera. *Id.*

§ 1519. Samuel faced a count of lying to the FBI. *Id.* § 1001(a)(2). All sixteen defendants faced a conspiracy count—that they agreed to commit the hate crimes, conceal the evidence, and lie to the FBI. *Id.* § 371.

After a ten-day trial, the jury convicted all sixteen individuals on most of the charges. It found they had conspired to commit hate crimes and to conceal evidence but not to lie to the FBI. The jury returned guilty verdicts on five of the six hate crime counts, the obstruction count related to hiding the camera, and the false statement count. The district court sentenced the defendants to terms ranging from one year and a day to fifteen years.

In the first appeal, we reversed the hate crimes convictions based on a faulty jury instruction. *United States v. Miller*, 767 F.3d 585, 601 (6th Cir. 2014). On remand, the government declined to retry those counts. That left the district court to resentence the defendants on the remaining convictions: (1) conspiring to conceal evidence (all sixteen defendants), (2) concealing the camera (three defendants), and (3) lying to the FBI (Samuel). The district court resentenced eight defendants to time served. The court resentenced the other eight to terms ranging from forty-three to 129 months. All but one defendant appeals.

II.

Fifteen defendants challenge their extant convictions. But they did not challenge those convictions in their first appeal, and that makes all the difference.

In criminal case after criminal case, we have declined to allow a criminal defendant who fails to challenge part of a conviction in an earlier appeal to raise it in a later appeal. *See, e.g.*, *United States v. Traxler*, 517 F. App'x 472, 473–74 (6th Cir. 2013); *United States v. Brika*, 487 F.3d 450, 464–65 (6th Cir. 2007); *United States v. Adesida*, 129 F.3d 846, 849–50 (6th Cir. 1997). This approach is "well-settled," *United States v. Henry*, 472 F.3d 910, 913 (D.C. Cir. 2007) (per curiam), prevents "perpetual litigation," *United States v. McKinley*, 227 F.3d 716, 719 (6th Cir. 2000), and "encourage[s] compliance with fair and efficient procedure"—above all by encouraging defendants to raise all challenges to a conviction in one appeal, 18B Charles Alan

Wright et al., Federal Practice & Procedure § 4478.6 (2d ed. 2016). Seeing no fair reason to give full review to these arguments now, especially as no defendant has explained the omissions from the earlier appeal, we decline to break from this consistent practice. The defendants' belated challenges to their convictions—mainly to the sufficiency of the evidence for concealing evidence, for conspiring to do so, and for making a false statement to the FBI—thus fail.

The defendants resist this conclusion on several grounds. *First*, all fifteen of them argue that we must dismiss the indictment because the district court lacked "jurisdiction" over the crimes. The argument proceeds in four steps: (1) A defendant may raise "at any time while the case is pending" a claim that "the court lacks jurisdiction," Fed. R. Crim. P. 12(b)(2); (2) Congress lacked "jurisdiction" to enact the Hate Crimes Act because the Act exceeds Congress's power under the Commerce Clause; (3) if Congress lacked jurisdiction to pass the Act, the FBI lacked "jurisdiction" to investigate any potential violation of it, 18 U.S.C. §§ 1001, 1519; and (4) if the FBI had no jurisdiction to investigate those violations, the federal courts lack "jurisdiction" to hear prosecutions related to that investigation, such as concealing evidence and making false statements.

This argument shows why "'[j]urisdiction' is a word of many, too many, meanings." *United States v. Vanness*, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996); *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998). Look at the many ways the defendants use the word here. One relates to congressional power: The Constitution gives "Congress[] authority (jurisdiction, if you must) to pass a law." *United States v. Al-Maliki*, 787 F.3d 784, 791 (6th Cir. 2015). One relates to executive-branch power: To "protect[] . . . official inquiries," the FBI's "jurisdiction" for the purposes of obstruction statutes extends to any investigation based on "explicit statutory authority." *Bryson v. United States*, 396 U.S. 64, 70–71 (1969). And one relates to judicial power: The federal courts have "jurisdiction" over "all offenses against the laws of the United States." *Al-Maliki*, 787 F.3d at 791; *see* 18 U.S.C. § 3231.

That the term "jurisdiction" may refer to the powers of all three branches of the federal government does not mean that a jurisdictional failing in one setting has jurisdictional

consequences in another. It's bad enough that courts often talk too loosely about jurisdiction in just one of these settings: the power of the federal courts. It would be much worse if courts mixed and matched references to jurisdiction in the manner that this argument does: talking about congressional power as though it is a form of judicial power or executive-branch power as though it is a form of judicial power. That is not what Criminal Rule 12(b)(2) does. It refers to just one of these meanings of jurisdiction—one of these types of federal power. When it says that a defendant may raise "at any time while the case is pending" a claim that "the court lacks jurisdiction" over the case, it refers only to the power of the federal courts—the subject matter jurisdiction of those courts to hear certain cases and controversies.

That clarification suffices to reject the defendants' argument. Plain as day, the district court had subject matter jurisdiction over each of the charged federal crimes at issue today. *Al-Maliki*, 787 F.3d at 791. And that judicial power did not disappear due to allegations that these crimes were uncovered in the course of an investigation for violations of the Hate Crimes Act, even if (as they say) the Act exceeded congressional power. *Id.*; *see Bryson*, 396 U.S. at 70–71 & n.11. The initial role of the Hate Crimes Act in these prosecutions, whether the Act is constitutional or not, did not deprive the federal courts of jurisdiction over the prosecutions and trial. After all, the federal courts have long had jurisdiction, according to one case of note, to tell the legislative and executive branches when they have overstepped their bounds. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78 (1803).

Because the defendants' argument does not go to *the court's* jurisdiction, they forfeited it by not raising it before trial. Fed. R. Crim. P. 12(b)(3)(B). Even so, they could have raised it and faced plain error review in their first appeal. *United States v. Edmond*, 815 F.3d 1032, 1043–44 (6th Cir. 2016). They did not do so.

At this point and in the face of this double forfeiture, the most the defendants could hope for is some form of plain error review, and even that would be generous under our caselaw. *Cf. Howe v. City of Akron*, 801 F.3d 718, 743 (6th Cir. 2015). As a brief review of the merits of these forfeited arguments shows, they do not remotely meet that standard. Even if the Hate

Crimes Act is unconstitutional, a point we need not decide, that did not obligate the district court to dismiss the *obstruction-of-justice* charges. "Our legal system provides methods for challenging the Government's right to ask questions" about the enforcement of unconstitutional statutes, the Supreme Court has said in a similar context, and "lying is not one of them." *Bryson*, 396 U.S. at 72. Concealing evidence is not one either. Anna Miller and Levi Miller also argue that there was insufficient evidence to convict them of conspiracy to obstruct justice. This too is a heavy lift on plain error review. Anna planned an attack, participated in it, and later was there for a phone conversation that discussed whether to "get rid" of the camera that contained incriminating photos. R. 556-9 at 6. Levi took part in one of the photographed attacks and placed a phone call that discussed what to do with the camera. *See generally United States v. Mathis*, 738 F.3d 719, 735 (6th Cir. 2013); *United States v. Tragas*, 727 F.3d 610, 617–18 (6th Cir. 2013).

*Second*, several defendants argue that the convictions for conspiracy to conceal evidence cannot stand because we reversed them already. That would be a powerful argument—if it were true. A conspiracy requires an agreement to violate the law. 18 U.S.C. § 371. The jury found that all sixteen defendants formed a single conspiracy to violate two laws: the hate crimes statute (by attacking the various victims) and the concealing-evidence statute (by hiding the camera, among other acts). When we reversed the hate crimes convictions due to a faulty instruction, the defendants say, we necessarily reversed any conspiracy conviction resting on those hate crimes.

That might be true if the conspiracy conviction rested *only* on the underlying hate crimes. *Yates v. United States*, 354 U.S. 298, 312 (1957); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 60–61 (2008) (per curiam); *Griffin v. United States*, 502 U.S. 46, 55–56, 58–60 (1991). But we know that it did not. Using a special verdict form, the jury found "that the conspiracy was proven and that the object(s) of the conspiracy was/were to" commit hate crimes *and* conceal evidence. R. 230 at 1. Concealing evidence violates its own law. No one challenges the court's instruction on that count. And the jury found the defendants conspired to do it. The conspiracy convictions in short were not overruled. *See United States v. Cone*, 714 F.3d 197, 211 (4th Cir. 2013); *United States v. Pelisamen*, 641 F.3d 399, 406–07 (9th Cir. 2011); *United States v.*

*McNutt*, 908 F.2d 561, 565 (10th Cir. 1990); *see also United States v. Neuhausser*, 241 F.3d 460, 471 n.8 (6th Cir. 2001).

*Third*, one defendant, Anna Miller, seeks fresh review of her conviction-related challenge. Anna says she challenged her conspiracy conviction in the first appeal, noting that there was insufficient evidence to show she joined a conspiracy to conceal evidence. What she argued, however, is that "The Only Conspiracy The Government Could Establish For Anna Miller Was A Conspiracy To Cut [one victim's] Hair." No. 13-3183, Appellant's Br. 35. Following that statement was a concession that Anna Miller may have joined a conspiracy to cut a single victim's hair, but that, due to a culture of gender separation in Amish communities, the evidence could not show she joined a conspiracy to commit multiple hair and beard cuttings. The argument thus focused on the jury's finding that the conspiracy extended to *several* attacks. It never mentioned, let alone challenged, the other finding that the conspiracy intended not just to perform the attacks but also to conceal evidence related to them. To preserve an argument, it does not suffice to mention a point obliquely, then focus the rest of the brief on other arguments. *Kuhn v. Washtenaw County*, 709 F.3d 612, 624–25 (6th Cir. 2013). That is all Anna did in the earlier appeal and we decline to review afresh this newly invented argument.

*Fourth*, Levi Miller argues that, because we said in the prior appeal that "the erroneous jury instructions require a new trial," *Miller*, 767 F.3d at 602, the government *had* to retry the defendants. Not so. Yes, we invalidated the hate crimes convictions. But that left the government, not us, with the choice of whether to seek a new trial. We did not order a new trial, and almost assuredly could not have done so. That was for the government to decide.

III.

Eight of the defendants challenge their new sentences as procedurally and substantively unreasonable. District courts have wide latitude in each respect. *Gall v. United States*, 552 U.S. 38, 51 (2007).

A.

*1. Conspiracy guideline.* Based on each defendant's conviction for conspiracy to conceal evidence, the district court used the conspiracy guideline as its starting point. U.S.S.G. § 2X1.1. The guidelines treat a single conspiracy with multiple objects as separate conspiracies, one for each object. *Id*. § 1B1.2(d). That creates difficulties if "the verdict or plea does not establish which offense(s) was the object of the conspiracy." *Id.* § 1B1.2 cmt. n.4. When that issue arises, the district court must "sit[] as a trier of fact" and decide for itself which objects it "would convict the defendant of conspiring to commit." *Id.* Because their conspiracy count included multiple objects, Johnny and Daniel Mullet argue that the district court had to perform this task and decide for itself whether there was sufficient evidence to convict each of them of conspiring to conceal evidence. But there was no evidentiary gap to fill. The jury's special verdict establishes which offense was the object of the conspiracy—as noted above. No error occurred.

*2. Kidnapping guideline.* After starting with the conspiracy guideline, the district court followed a string of cross-references before applying the "kidnapping" guideline. This path, say the defendants, led the court astray when it invoked an unduly broad definition of kidnapping.

Here's what the court did. A cross-reference in the conspiracy guideline sent the court to the obstruction of justice guideline. *Id*. §§ 2J1.2(c)(1), 2X1.1(a). The obstruction guideline in turn led the court to the hate crimes guideline, because the obstruction hampered a hate crimes investigation. *Id*. §§ 2H1.1, 2J1.2(c)(1), 2X3.1. The hate crimes guideline cross-references "the offense guideline applicable to any underlying offense," *id*. § 2H1.1(a)(1), which includes "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law," *id*. § 2H1.1 cmt. n.1; *see also id*. § 1B1.3(a); *United States v. Conley*, 186 F.3d 7, 25–26 (1st Cir. 1999). And that, to complete the path, led to the "kidnapping" guideline, U.S.S.G. § 2A4.1, because the jury determined that the defendants committed a generic state law form of kidnapping by restraining their victims in order

to cut their beards.  This guideline, to use its full name, applies to "[k]idnapping, [a]bduction, [u]nlawful [r]estraint." *Id*. § 2A4.1.

The jury addressed whether the defendants kidnapped their victims because, if they did, the statutory maximum for the hate crimes increased from ten years to life.  18 U.S.C. § 249(a)(2)(A).  "[F]or purposes of this case," the court instructed the jury, "'kidnapping' means to restrain and confine a person by force, intimidation, or deception, with the intent to terrorize or cause bodily injury to that person, or to restrain a person's liberty in circumstances that create a substantial risk of bodily harm to that person."  R. 527 at 63.  The court used this definition because it "embodies the definition and understanding of kidnapping that is used in almost all of the country, including Ohio."  R. 314 at 34; *see* Ohio Rev. Code § 2905.01.

We need not decide whether this definition of "kidnapping" is the one courts should use under the Hate Crimes Act.  Either way, anything that qualifies as "kidnapping" under this definition qualifies as "[k]idnapping, [a]bduction, [u]nlawful [r]estraint" under § 2A4.1 of the guidelines.  "[U]nlawful restraint" in the guideline, we have said, is "a residual term designed to cover all forms of physical or forcible restraint of a victim." *United States v. Gray*, 16 F.3d 681, 684 (6th Cir. 1994).  "[R]estrain[ing]" while either creating "a substantial risk of bodily harm" or intending to "terrorize or cause bodily injury" falls within the definition.  R. 542 at 31.

Other cases confirm that state crimes that define kidnapping much as the court did here qualify as "[k]idnapping, [a]bduction, [u]nlawful [r]estraint." *See United States v. Anderson*, 608 F. App'x 369, 372–75 (6th Cir. 2015); *United States v. Pego*, 567 F. App'x 323, 329–30 (6th Cir. 2014).  The Supreme Court elsewhere has equated "unlawful restraint" with "compell[ing] to remain where [a person] did not wish to remain, or compell[ing] to go where she did not wish to go," through the use of "force, fear or deception." *Chatwin v. United States*, 326 U.S. 455, 460 (1946).  And we have rejected narrow definitions of kidnapping in other parts of the guidelines, *see United States v. Soto-Sanchez*, 623 F.3d 317, 323 (6th Cir. 2010), a conclusion that takes on added weight when dealing with a guideline that goes beyond "[k]idnapping" to include "[u]nlawful [r]estraint."

*United States v. Epley* does not say anything to the contrary. 52 F.3d 571 (6th Cir. 1995). It held that the guideline was inapplicable in a prosecution of police officers for planting drugs in order to stage an arrest. *Id.* at 574, 582. But *Epley* came out the way it did because the only state law that the officers' conduct possibly violated was a misdemeanor that involved restraint with no threat of force or risk of injury. *Id.* at 582. Not so here, as the district court's definition of kidnapping required restraint *and* something more. Nor is the Ohio analogue used here a misdemeanor. It is a felony of the first or the second degree and subject to a lengthy prison term. Ohio Rev. Code § 2905.01(C)(1); *see also id.* § 2929.14.

Neither is it a problem that the district court's definition of "kidnapping" captures conduct that may not satisfy the guideline's definition of "physical restrain[t]." U.S.S.G. § 3A1.3; *see id.* § 1B1.1 cmt. n.1(K). This court has already said that "[u]nlawful [r]estraint" under § 2A4.1 is broader and "less severe" than "physical restraint." *Gray*, 16 F.3d at 684 n.1.

The defendants also miss the mark in suggesting that the district court could not consider the conduct as "kidnapping" because this court reversed the hate crimes convictions and the related kidnapping findings. To consider conduct that does not increase the statutory penalty range, a sentencing court must find that it occurred by a preponderance of the evidence. *United States v. O'Brien*, 560 U.S. 218, 224 (2010). The district court found, even after taking into account the correct instruction, that the defendants committed hate crimes, a finding this court's prior decision did not foreclose, *see Miller*, 767 F.3d at 600–02. The district court then used the jury's kidnapping findings to support application of the § 2A4.1 guideline. *Cf. United States v. Mathis*, 476 F. App'x 22, 23–24 (5th Cir. 2012); *United States v. McDougle*, 82 F. App'x 153, 157–58 (6th Cir. 2003). That this court reversed the relevant convictions does not make these decisions improper. If a court can base a sentence on *acquitted* conduct, it can also rely on conduct that supports convictions *vacated* due to legal errors. *See United States v. Alsante*, 812 F.3d 544, 550–51 (6th Cir. 2016).

*3. Vulnerable victim enhancement.* The district court enhanced the defendants' guideline ranges because some of the assault victims were elderly or in poor health. *Cf. United States v.*

*Moon*, 513 F.3d 527, 541 (6th Cir. 2008). The guidelines permit an enhancement where a defendant "knew or should have known that a victim of the offense was a vulnerable victim," which may require that the victim was "unusually vulnerable." U.S.S.G. § 3A1.1(b)(1) & cmt. n.2; *see United States v. Volkman*, 797 F.3d 377, 398 (6th Cir. 2015). The guidelines mention age and physical condition as characteristics that may make a victim "unusually vulnerable." U.S.S.G. § 3A1.1 cmt. n.2. The district court heard significant testimony about the advanced age and serious illness of several victims. In view of the close personal and familial connections between the assailants and the victims, the district court did not clearly err in finding that the defendants knew or should have known as much.

The defendants protest that they did not choose any victims because of their vulnerability, noting that other victims suffered the same fate and were neither old nor sick. But defendants remain eligible for the enhancement even if they did not choose each victim *based on* vulnerability. *United States v. Brawner*, 173 F.3d 966, 973 (6th Cir. 1999).

The defendants also protest that the district court did not impose this enhancement at the original sentencing. But when we remand a criminal case for new sentencing and do not limit the court's discretion through a limited remand, it may "redo the entire sentencing process, including considering new evidence and issues." *United States v. McFalls*, 675 F.3d 599, 604 (6th Cir. 2012).

Nor does the addition of a new enhancement establish a vindictive sentence. Yes, *North Carolina v. Pearce* creates a presumption of vindictiveness if a sentence after a remand is longer than the original sentence. *See* 395 U.S. 711, 723–26 (1969). But that presumption has no role to play where a "defendant ultimately receives a lower sentence at resentencing," even if his sentence increased on individual counts. *United States v. Rodgers*, 278 F.3d 599, 604 (6th Cir. 2002); *see also United States v. Hagler*, 709 F.2d 578, 579 (9th Cir. 1983). All of the defendants received lower overall sentences after the remand, and none of them points to any evidence of vindictiveness. *See Rodgers*, 278 F.3d at 604–05.

*4.    Leadership enhancement.*    The district court imposed a four-level leadership enhancement to Samuel's guideline calculation because "the evidence definitely showed that Bishop Mullet le[d] the community in general and le[d] this conspiracy." R. 732 at 48; *see* U.S.S.G. § 3B1.1(a). The enhancement was improper, Samuel contends, because there was no evidence of his role in concealing evidence, which was the sole remaining object of the conspiracy. Enhancements of this sort, we have held, "depend[] on a number of factual nuances that a district court is better positioned [than an appellate court] to evaluate," meaning we exercise "deferential" review. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013).

The district court had ample reason to believe that Samuel played a starring role in this conspiracy. He was the bishop of the Bergholz community and controlled life there. One witness described him as "a dictator." R. 528 at 205. After each attack, including those where the assailants used the camera, everyone met at Samuel's house. He also gave instructions to others about the camera. All of that suffices to uphold the enhancement.

*5.    Rule 32 violations.*    Even if the calculation was correct, Samuel argues, the district court erred by failing to follow Criminal Rule 32, which sets out several sentencing procedures. The court, for example, did not ask whether Samuel and his attorney had read the presentence report. *See* Fed. R. Crim. P. 32(i)(1)(A). Samuel concedes, however, that any Rule 32 "errors in themselves may not be prejudicial," and gives us no reason to think they were. Samuel Mullet Br. 40. Harmless errors do not require new sentences.

*6.    Mathematical computation.*    The government proposed five tiers to reflect where each defendant "fall[s]" on "a range of culpability." R. 545 at 125. After describing its sentencing considerations in detail, the district court adopted the tiered approach in the initial sentencing proceeding. It sentenced one defendant (Samuel) to 180 months, four to 84 months, three to 60 months, two to 24 months, and the remaining six to a year and a day. Those in the lowest two tiers had already completed their sentences by the time of the resentencing.

When discussing the eight defendants in the other three groups, the court noted during resentencing it "was very careful [at the original sentencing] to group and rank the defendants

according to . . . culpability . . . and . . . believe[d] it [was] still important to do that." R. 732 at 76. The court decided as a result to determine sentences based on (1) the seriousness of each defendant's conduct, (2) this court's decision reversing the hate crimes convictions, and (3) the prior groupings into tiers. Taking all of this into account, the judge decided that Johnny Mullet and Levi Miller's sentences should decrease from 84 months to the newly applicable statutory maximum of 60 months. To maintain the tiers and keep proportionality between them, the court reduced the sentences of the other six defendants by the same proportion: 28%. Resorting to this calculation, the defendants argue, was procedurally unreasonable, because it was "arbitrary," Lester Miller Br. 12, and "ma[de] no sense," Samuel Mullet Br. 48.

That is a new-found objection. The defendants said nothing of the sort at the resentencing proceeding, meaning that the strictures of plain error review apply. *See United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc). This argument does not satisfy that high bar. A district court may choose to "determine a defendant's sentence in light of a co-defendant's sentence." *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007). If the district court does so and wishes to keep sentences among the defendants relatively fair, it is hard to believe that it could be wrong, let alone plainly wrong, to use proportions in doing so.

Samuel responds that the problem is that the district court "[f]ocus[ed] solely on a mathematical formula," which it cannot do. Samuel Mullet Br. 49. But the court expressly used its calculation in the service of several objectives, including "reflect[ing] the seriousness of" each defendant's conduct. R. 732 at 78. And proscriptions against using a formula in sentencing typically prohibit this court from letting math substitute for individualized appellate review. *See Gall*, 552 U.S. at 47–49. They do not apply with quite the same force to the district court, which has "plenary sentencing responsibilities," *United States v. Turner*, 602 F.3d 778, 788 (6th Cir. 2010), and may reasonably compare the defendants' culpability in setting fair sentences for each.

B.

The defendants claim that their sentences were too long in relation to the seriousness of the offenses and greater than necessary to satisfy the imperatives of federal sentencing law. 18 U.S.C. § 3553(a). We disagree. The sentences were substantively reasonable.

At the original sentencing, the district court addressed several factors that entered into its choice of tiers and sentences. "None of the defendants," it said, "has any prior record." R. 545 at 143. Most have "very young children" and "are not likely to re-offend." *Id.* The victims, however, must "bear[] the emotional scars and probably will for the rest of their lives." *Id.* It deemed the imposed sentences "significant enough to punish . . . and to deter." *Id.* at 149. The district court's percentage reductions from the original sentences meant these concerns affected the new sentences. But the court did not leave it at that. At the second sentencing proceeding, it reviewed "multiple considerations," including "everything [it] c[ould] learn about each defendant, [and] everything [it] c[ould] learn about [his or her] conduct." R. 732 at 72–73. The court made reasonable choices in balancing the relevant factors and setting the sentences.

Against this reasoning, the defendants fail to rebut the presumption of substantive reasonableness that applies to their within-guidelines sentences (or in most instances below-guidelines sentences). *See United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008); *Vonner*, 516 F.3d at 389–90. They argue the sentences create "unwarranted" disparities as compared to the average sentences for defendants convicted nationwide of obstruction or hate crimes. 18 U.S.C. § 3553(a)(6). But because the point of the guidelines is to reduce disparities, general statistics that cover a multitude of other crimes committed in a multitude of other ways do not create an "unwarranted" disparity. *See United States v. Waltman*, 529 F. App'x 680, 685 (6th Cir. 2013) (per curiam). Samuel also complains the court did not consider as mitigation that his wife had recently passed away, among other personal tragedies. The court, however, said it reviewed each defendant's submissions, and in any event was not obligated to discuss everything raised by every defendant. *United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006). Lester

Miller says that the court confused him with Lester Mullet, but the transcript makes clear that the court knew about this potential confusion and steered clear of it.

     For these reasons, we affirm.