NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 19a0171n.06

Case No. 17-5883

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 03, 2019

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| DARRIES LEON JACKSON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: COOK, STRANCH, and NALBANDIAN, Circuit Judges.

COOK, J., delivered the opinion of the court in which STRANCH and NALBANDIAN, JJ., joined. STRANCH, J. (pg. 16), delivered a separate concurring opinion.

COOK, Circuit Judge. A jury found Darries Jackson guilty of two counts of possessing ammunition as a felon. Deciding that Jackson's prior convictions qualified as "violent felonies" under the Armed Career Criminal Act (ACCA), and in light of other evidence implicating him in a murder and a shooting, the district court sentenced him to concurrent life sentences. He appeals, arguing the Eastern District of Tennessee's grand jury pool unconstitutionally underrepresented African Americans, tainting his indictment, and that the court should have excluded as privileged his wife's trial testimony. He also appeals his sentence, claiming that his predicate Florida convictions are not "violent felonies," and that his sentence is substantively unreasonable. We AFFIRM.

## I.    BACKGROUND

One night in October 2014, somebody fatally shot Bennie Bowlin in the head at her home. Less than two hours later, a gunman fired multiple shots into Bowlin's daughter's residence, striking the daughter, Kathy Ramos, but fortuitously missing her two-year-old granddaughter sleeping in the same bed.  Officers found matching .380 caliber shell casings at each location; forensics later revealed that the casings from both crime scenes came from the same gun.  Ramos told investigators that she figured Jackson—with whom she had recently had an affair—was the shooter in both incidents, noting that he had threatened her with a gun during a visit earlier that week and that he drove a white Plymouth van.  A neighbor saw a white Plymouth van parked in Ramos's driveway shortly before the shooting.  Officers arrested Jackson the following morning. A search of his house and his white Plymouth van revealed multiple .380 rounds in both places, and some of his clothing tested positive for gunshot residue.  Additionally, during an interview, a detective asked Jackson why he shot Ramos, to which he replied that he didn't know why Ramos and her mother were shot.  Yet at that point in the interview, no detective had revealed anything to Jackson about the mother, Bowlin, being shot.

Police investigators also interviewed Jackson's wife, Jessica Jackson.  She volunteered statements to them on at least three occasions and testified before a grand jury.  She told the police that her husband was distressed because he had recently confessed to his extramarital affair with Ramos.  According to her later trial testimony, she accompanied her husband to Walmart a couple of days before the shootings.  At his direction, and knowing he was a felon, she purchased 9mm ammunition for him.  When Jackson later realized that these rounds would not fit his handgun, he returned to Walmart himself, exchanging the 9mm rounds for .380 caliber bullets that fit his pistol.

On the night of the shootings, he told his wife that he planned to murder his former mistress. When Mrs. Jackson tried to talk him out of it, he said that he would kill Ramos's mother or son instead.

Before state prosecutors tried Jackson for murder and attempted murder in state court, a federal grand jury indicted Jackson on the only charges implicated in this appeal: two counts of possessing ammunition (one each for the 9mm and .380 caliber bullets) as a felon in violation of 18 U.S.C. § 922(g)(1). After a trial at which Jackson represented himself assisted by "elbow counsel," a jury found him guilty of both.

At sentencing, however, the Government presented evidence that Jackson murdered Bowlin and attempted to murder Ramos. By this time, Tennessee grand juries had indicted him for both alleged crimes (plus a charge of felony reckless endangerment for nearly shooting Ramos's child). The district court found by a preponderance of the evidence that he committed both crimes. The court then considered that evidence in sentencing him to within-Guidelines concurrent life sentences. He timely appeals.

## II. DISCUSSION

### A. Grand Jury Pool Composition

Jackson moved to dismiss his indictment, alleging that "African-Americans . . . were 'systematically excluded' from the grand jury," thereby violating his constitutional due process right. A magistrate judge conducted an evidentiary hearing where the court heard testimony from the Deputy Clerk of Courts for the Eastern District of Tennessee concerning the district's grand jury selection procedures. The court also considered jury pool statistics from 2005, 2009, and 2013—the years the district refilled its jury wheel (or jury pool).

Briefly summarized, the Eastern District of Tennessee draws the names for its jury wheel from voter registration lists in the year following a presidential election. An algorithm randomly selects 1,000 people from the voter rolls; the Clerk of Courts then mails a qualification questionnaire to each person. The questionnaire requires respondents to indicate their race. The clerk's office enters returned questionnaires into a computer program that removes disqualified individuals (e.g., illiterate persons, minors, and noncitizens). No one is eliminated on account of race. The remaining individuals constitute the qualified jury pool eligible for selection to serve on grand and petit juries in the district.

The magistrate summarized the district's grand jury statistics using this table:

| Year | Total Qualified in Jury Pool Wheel | African–Americans in Qualified Jury Wheel ("QJW") | Percentage of African-Americans in QJW | Percentage of African-Americans in population area |
|---|---|---|---|---|
| 2005 | 429 | 8 | 1.86 % | 2.2 % |
| 2009 | 306 | 4 | 1.31 % | 2.2 % |
| 2013 | 541 | 4 | .74 % | 2.3 % |
| **TOTAL** | **1,276** | **16** | **1.25 %** | **2.3 %** |

Jackson highlights the persistent disparity between the proportion of African-Americans living within the district and the percentage of African-Americans in the qualified jury wheel. He argues that these figures demonstrate that the district's jury selection procedures unconstitutionally exclude African-Americans, tainting his indictment and convictions.

Jackson can challenge the district's grand jury selection process in one of three ways. First, he could try to show that the process intentionally discriminates. *Castaneda v. Partida*, 430 U.S. 482, 493 (1977). Second, he could allege that the system substantially underrepresents an identifiable group over a significant period, where the selection procedure "is susceptible of abuse or is not racially neutral." *Id.* at 494. Third, he could demonstrate underrepresentation in the

particular grand jury that indicted him, and that the selection process for that grand jury was open to discrimination. *Jefferson v. Morgan*, 962 F.2d 1185, 1191 (6th Cir. 1992).

He chooses the second, alleging that the district's selection procedures resulted in significant underrepresentation of African-Americans over a lengthy time frame. To prevail, he must satisfy a three-part test. First, he must "establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda*, 430 U.S. at 494. Second, "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time." *Id.* Finally, he must show that the "selection procedure . . . is susceptible of abuse or is not racially neutral," thereby "support[ing] the presumption of discrimination raised by the statistical showing." *Id.*

The magistrate judge found that Jackson's claims failed at step three because Jackson provided no evidence that the district's procedure is open to abuse or that it systematically excludes African-Americans from the grand jury pool. Over Jackson's objection, the district court adopted the magistrate's recommendation in full. We review de novo. *United States v. Ovalle*, 136 F.3d 1092, 1100 (6th Cir. 1998).

On appeal, Jackson still fails to identify any feature of the district's grand jury selection processes that is "susceptible of abuse or is not racially neutral." *See Castaneda*, 430 U.S. at 494. Instead, he merely emphasizes African-Americans' underrepresentation in the district's jury wheel relative to their share of the district's population. Citing our unpublished decision in *Bates v. United States*, 473 F. App'x 446, 450 (6th Cir. 2012), he claims that the longstanding disparity "is sufficient to establish a per se systematic exclusion in this district."

True, the *Bates* court recognized that "extreme underrepresentation may be enough to establish a *per se* systematic exclusion." *Id.* But as the Government points out, we have never so held. Notably, *Bates* also teaches that "a long-standing statistical disparity is not enough to establish systematic exclusion," and that to hold otherwise would essentially collapse the second and third prongs of the *Castaneda* test into one inquiry. *Id.*

Additionally, we have recognized that "[v]oter registration lists are the presumptive statutory source for potential jurors." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008) (citing 28 U.S.C. § 1863(b)). No circuit court has ever held that a trial court needs to supplement the voter rolls with additional names "simply because an identifiable group votes in a proportion lower than the rest of the population." *Id.* (quoting *United States v. Test*, 550 F.2d 577, 587 n.8 (10th Cir. 1976)). Jackson provides no rationale for diverging from that body of precedent.

### B. Mrs. Jackson's Testimony Against Her Husband

Mrs. Jackson testified against her husband at trial pursuant to a subpoena. Jackson argues that the district court should have barred all or some of that testimony under either of the two marital-testimony privileges—the adverse-spousal-testimony privilege or the marital-communications privilege. *See United States v. Underwood*, 859 F.3d 386, 390 (6th Cir. 2017) (outlining both marital privileges).

1. Mrs. Jackson's Waiver of Her Adverse-Spousal-Testimony Privilege

A witness can be "neither compelled to testify nor foreclosed from testifying" against his or her spouse. *Trammel v. United States*, 445 U.S. 40, 53 (1980). This privilege may be invoked only by the testifying spouse, *id.*, and we review a district court's finding that a spousal witness waived it de novo, *Underwood*, 859 F.3d at 390.

Jackson disputes whether his wife knowingly and voluntarily waived her spousal privilege. Ordinarily, he would lack standing to raise such a claim because it was his *wife's* privilege to not testify. *See id.* at 392 (noting that the non-testifying spouse "holds no right to the privilege and thus lacks standing to raise the issue on appeal"). The Government forfeited any standing argument, however, by neglecting to raise the matter in its brief.

Even so, Jackson's claim fails. Before Mrs. Jackson testified, the district judge engaged her in a lengthy colloquy, explaining the nature of her privilege. The judge repeatedly asked her whether her past statements had been voluntary, and whether she was voluntarily testifying against her husband at trial. Relevant excerpts follow:

> **Q.** All right. Before the jury hears your testimony, Ms. Jackson, I need to advise you of a privilege which exists in federal law. It's called an adverse, an adverse testimony privilege. What it means is that one spouse cannot be forced to testify against the other in a criminal proceeding. Now, the privilege belongs to you, not to your husband. In other words, he can't invoke it.
>
> Are you here voluntarily today to testify against your husband?
>
> **A.** Yes, sir.
>
> * * *
>
> **Q.** And how many times did you make statements—on how many different occasions did you make statements to the [police]?
>
> **A.** I'd say at least three or more, I mean.
>
> **Q.** Were you ever forced to make any of those statements?
>
> **A.** No.
>
> **Q.** Did you make them all voluntarily?
>
> **A.** Yes.

**Q.** All right. I guess let me get to the bottom of this. I've advised you that you can invoke the privilege and not be forced to testify against your husband. Do you wish to invoke that privilege?

**A.** I just fear if I didn't, I'd be in trouble.

\* \* \*

**Q.** Well, what kind of trouble? What are you afraid of?

**A.** I'm just—I mean, having I bought ammunition and then not being the ammunition for, that was—I don't know, just, I mean, I'm fearful because he's a felon, and I've never been in trouble before.

**Q.** Okay. Has the government agreed that you will not be prosecuted if you testify?

**A.** No, there's nothing that I know of.

**Q.** Okay. For whatever the reason, do you want today to invoke the privilege against testifying?

**A.** I'd like to not testify.

**Q.** All right.

**A.** But I don't want to be in trouble.

**Q.** I don't have anything—I don't have any part in the decision whether to prosecute you or not prosecute you, that's a decision that has to be made by the U.S. Attorney or state authority. The only thing I can do here today is advise you of the privilege and ascertain whether or not you want to invoke that privilege.

So do you want to testify or not?

**A.** I'll testify.

At this point, Jackson attempted to object, arguing that his wife hadn't had enough time to make a considered decision on whether to testify. The court again took care to reconfirm Mrs. Jackson's waiver:

**Q.** Ms. Jackson, how long have you been married to Mr. Jackson?

**A.** It will be 14 years this June.

**Q.** All right. Do you understand what I've said to you about the privilege?

**A.** Yes, sir.

**Q.** Is this the first time you've heard about this privilege?

**A.** My husband's mentioned it before and talked to me about it.

**Q.** And what has he said to you about it?

**A.** That, I mean, it's my constitutional right to not testify if I didn't want to.

**Q.** All right. Has he threatened you in any way?

**A.** No, he hasn't.

**Q.** All right. Have you had enough time to think about this decision?

**A.** Yes.

\*\*\*

**Q.** Given the fact that you told me you've had enough time to consider this, do you want—or do you intend to respond to questions put to you by the government here today by virtue of this subpoena that's been issued, even though you have a privilege not to do so? In other words, do you intend to testify?

**A.** Yes, I'll testify.

**The Court:** All right. I think that's sufficient for the record.

Jackson claims that despite this extensive questioning, the district court did not establish that Mrs. Jackson knowingly and voluntarily waived her spousal privilege. His argument centers on Mrs. Jackson's fear of getting in "trouble" if she didn't testify. It isn't clear, he says, "whether Mrs. Jackson feared the government would prosecute her for acts conducted outside of court," such as being a straw buyer for her husband's ammunition, or if she "feared the government would prosecute her for deciding not to waive the spousal privilege." Appellant Br. 13. Given that the court compelled her presence via subpoena and that she lacked her own lawyer to explain the possible consequences of her testimonial decision, Jackson maintains that his wife could have

testified out of fear that she would be prosecuted for invoking her privilege. He suggests we analyze his claim using the same "totality of the circumstances" approach we use to assess whether a person waived his right against self-incrimination "voluntarily, knowingly, and intelligently." *See, e.g.*, *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation omitted); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

The record reveals that the district court managed this issue adequately. The "preferred" procedure when one spouse is called to testify against the other is for the court "to ascertain, prior to the introduction of [the spouse's] testimony, the circumstances under which she was persuaded to testify." *United States v. Sims*, 755 F.2d 1239, 1244 (6th Cir. 1985). That is precisely what happened here. The excerpts above demonstrate that the court took pains to satisfy itself that Mrs. Jackson waived her privilege knowingly, voluntarily, and intelligently before allowing her to testify. We see no basis for second-guessing its decision.

## 2. Applicability of the Marital-Communications Privilege

Jackson could, however, properly move to exclude portions of his wife's testimony against him under the marital-communications privilege. This privilege exists "to protect information privately disclosed between husband and wife in the confidence of the marital relationship." *Trammel*, 445 U.S. at 51; *see also United States v. Porter*, 986 F.2d 1014, 1018 (6th Cir. 1993) (noting that marital-communications privilege "exists to insure that spouses generally, prior to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law" (quoting *United States v. Byrd*, 750 F.2d 585, 590 (7th Cir. 1984))). Either spouse may assert it upon establishing three prerequisites. *Porter*, 986 F.2d at 1018. First, at the time of the communication, the putative spouses must have been married under state law. *Id.* Second, the communication must have been "utterances or

expressions intended by one spouse to convey a message to the other." *Id.* (quoting *United States v. Lustig*, 555 F.2d 737, 748 (9th Cir. 1977)). Finally, the spouses must have made the communication in confidence. *Id.*

Communications "regarding joint ongoing or future patently illegal activity," however, enjoy no protection. *Sims*, 755 F.2d at 1243. Under such circumstances, "the public's interest in discovering the truth about criminal activity outweigh[s] the public's interest in protecting the privacy of marriage." *Id*.

Jackson maintains that two components of his wife's trial testimony were privileged and should have been excluded. In examining those, we will reverse only if the district court abused its discretion in a fashion that affected the trial's outcome. *United States v. Flemming*, 658 F. App'x 777, 787 (6th Cir. 2016) (citing *United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012)).

*Conversation regarding straw purchase of ammunition*. He first points to his wife's testimony that he asked her to purchase 9mm bullets on his behalf. For the joint-participant exception to apply, he claims, the Government needed to elicit testimony that Mrs. Jackson knew that her husband could not lawfully purchase ammunition. The Government alerted the district court before Mrs. Jackson took the stand that it intended to do so. Once she did, however, the prosecutor only asked her when she learned that her husband was a convicted felon; the Government did not ask her whether she knew that her husband could not buy the bullets himself lawfully. This omission, Jackson contends, means that the Government failed to show that Mrs. Jackson knowingly broke the law by acting as a "straw buyer" for her husband. Thus, the argument goes, her testimony regarding this conversation remained privileged and inadmissible.

But whether Mrs. Jackson knew the consequences of Jackson's felon status is immaterial. The Government highlights two criminal statutes that confirm that Mrs. Jackson's knowledge that her husband was a convicted felon sufficed. *See* 18 U.S.C. § 922(a)(6) (criminalizing misrepresenting facts "material to the lawfulness of the sale" of ammunition); § 922(d)(1) (making it a crime to "dispose" of ammunition to anyone known to "ha[ve] been convicted in any court of . . . a crime punishable by imprisonment for a term exceeding one year"). Both statutes establish that Mrs. Jackson's knowledge of her husband's criminal history justified admission of the testimony under the joint-participant exception.

*Conversation regarding Jackson's return to Walmart*. Mrs. Jackson also testified about her conversation with her husband when he realized that the 9mm ammunition did not fit his pistol:

> **Q.** Okay. And what did Mr. Jackson say when he realized that that ammunition didn't fit?
> **A.** Just that it didn't fit and he was going—he didn't really say, he just, just did, said that he was going to Walmart.
> **Q.** Did you go to Walmart with him?
> **A.** No, not the second time.

Jackson claims that there is "simply no basis" for applying the joint-activity exception to this communication because Mrs. Jackson's mere awareness of her husband's plan to return to Walmart doesn't implicate her in any joint criminal activity. He asserts that the communication "remained privileged and its admission was . . . in error."

But even if we agreed with Jackson, any error was harmless. The challenged testimony was relevant because it evidenced Jackson's return to Walmart to get different bullets. Yet the Government amply proved that point using other evidence. For example, Mrs. Jackson identified her husband in Walmart's surveillance footage showing him returning to the store and exchanging the 9mm bullets for .380 ammunition. Jackson fails to show that excluding the allegedly-

privileged testimony would have "affected the outcome of the trial." *See Morales*, 687 F.3d at 702 (quoting *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011)).

### C. Jackson's Prior Florida Convictions and the ACCA

In 1990, a Florida court convicted Jackson on four separate robbery charges. For the first time on appeal, Jackson challenges the district court's decision to consider these convictions "violent felonies" for enhanced sentencing purposes under the ACCA. He claims the court should give fresh review to this issue, but because he failed to raise it below, we instead evaluate for plain error. *United States v. Southers*, 866 F.3d 364, 366 (6th Cir. 2017).

Jackson's statute of conviction defined "robbery" as "the taking of money or other property which may be the subject of larceny from the person or custody of another . . . when in the course of the taking there is the use of force, violence, assault, or putting in fear." Fla. Stat. Ann. § 812.13(1) (West 1990). Construing this same statute, the Supreme Court determined that such a conviction amounts to an ACCA-predicate offense. *Stokeling v. United States*, 139 S. Ct. 544, 550, 554–55 (2019). Jackson's challenge therefore fails.

### D. Reasonableness of Life Sentences

Finally, Jackson asserts that his within-Guidelines sentence of two concurrent terms of life imprisonment is substantively unreasonable, a claim we review for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). We look to "the totality of the circumstances, giving 'due deference' to the sentencing judge, in recognition of his greater familiarity with the case, his superior position to find facts and assess credibility, and the institutional advantage that comes with frequent sentencing of offenders." *United States v. Houston*, 529 F.3d 743, 755 (6th Cir. 2008) (citing *Gall*, 552 U.S. at 51–52). Within that framework, "[a] sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible

factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010) (quoting *United States v. Lapsins*, 570 F.3d 758, 772 (6th Cir. 2009)). The district court enjoys a "presumption of reasonableness for within-guidelines sentences." *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc). Jackson may rebut that presumption, but doing so is "no small burden." *United States v. Simmons*, 587 F.3d 348, 365 (6th Cir. 2009).

First, Jackson underscores that his role in Bowlin's murder and Ramos's attempted murder remains unproven, and that at sentencing the district court lacked a "conviction or any trial testimony on the issue." But the court only needed to be convinced that Jackson committed those crimes by a preponderance of the evidence so long as these findings did not increase Jackson's statutory penalty range. *United States v. Mullet*, 822 F.3d 842, 851 (6th Cir. 2016); *see also United States v. O'Brien*, 560 U.S. 218, 224 (2010) ("Sentencing factors . . . can be proved to a judge at sentencing by a preponderance of the evidence."). Clearly, the court believed he had: at sentencing, the judge told Jackson that "[t]he probability that you committed the shooting of Kathy Ramos is very high." The court then proceeded to outline the evidence in the record implicating Jackson in that crime. Observing that the police found the same ammunition at both crime scenes, and that forensics concluded that the same gun was used in both shootings, the court likewise recognized that "the likelihood that [Jackson] committed the other [shooting] . . . is high as well." Finally, the court noted that "absolutely nothing" in the record suggested that someone else murdered Bowlin.

On appeal, Jackson provides no reason to doubt the district court's conclusion. True, the court weighed this unproven conduct heavily, but not unduly. "A district court may place great weight on one factor if such weight is warranted under the facts of the case." *United States v.*

*Adkins*, 729 F.3d 559, 571 (6th Cir. 2013). The evidence strongly suggests that Jackson murdered one person, tried to murder another, and nearly shot a two-year-old girl; the district court justifiably placed significant emphasis on such conduct.

Second, he claims that the court failed to give due weight to "the remoteness of much of Mr. Jackson's criminal history." Yet Jackson never raised temporal remoteness at sentencing, and a district court does not abuse its discretion by failing "to consider mitigating factors that were never raised." *United States v. Jackson*, 543 F. App'x 525, 531 (6th Cir. 2013) (citing *United States v. Walls*, 546 F.3d 728, 737 (6th Cir. 2008)).

Jackson may disagree with the district court's sentencing decision, but "[i]t is the essence of discretion that it may properly be exercised in different ways and likewise appear differently to different eyes." *United States v. Richards*, 659 F.3d 527, 551 (6th Cir. 2011) (quotation omitted). No argument proffered persuades us that the sentence imposed resulted from abuse of discretion.

### E. CONCLUSION

For these reasons, we AFFIRM.

JANE B. STRANCH, Circuit Judge, concurring. I join fully in the panel opinion. I write separately to express my concern about the increasing statistical underrepresentation of African American jurors in the grand jury pool of the Eastern District of Tennessee. The percentage of African Americans in this pool decreased from 2005 to 2009, and then again from 2009 to 2013, even as their percentage of the district's population held steady. By 2013, the percentage of African Americans in the jury pool was less than a third of the percentage of African Americans in the district. Although I agree that Jackson has not shown an underrepresentation extreme enough to establish "a per se systematic exclusion" of a cognizable group from the grand jury pool, our caselaw allows for such a claim. *See Bates v. United States*, 473 F. App'x 446, 450 (6th Cir. 2012). If the disparity demonstrated in this case continues, the question may merit revisiting in a future case. "Community participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).